IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 12-634-2 |
| | : | |
| BALDWIN CENTENO | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                                              **June 19, 2013**

Defendant Baldwin Centeno is charged with robbery and assault on federal territory based on two incidents, one of which occurred on June 20, 2012. Centeno asks this Court to suppress all out-of-court and in-court identifications of him as the perpetrator of the June 20 offenses by witnesses Chelsea Schmotzer and Dana Wilson. Because the out-of-court identification by Schmotzer was not the result of an unduly suggestive identification procedure, the motion is denied as to Schmotzer's out-of-court and in-court identifications. Because the out-of-court identification by Wilson, however, was the product of an unduly suggestive identification procedure and is also unreliable, Centeno's motion is granted as to any identification by Wilson. In reaching this conclusion, the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT[1]**

1.       On June 20, 2012, from approximately 10:00 p.m. to 10:40 p.m, Chelsea Schmotzer was

---

[1] The following facts are based on the testimony of Schmotzer, Wilson, United States Park Ranger Eli Bowers, and Philadelphia Police Detective Michael Repici at the June 17, 2013, hearing on the motion to suppress and the exhibits introduced at the hearing. Because this motion was filed only 11 days prior to the scheduled start of trial, and in order to minimize delay of the trial, this Memorandum only sets forth the basic facts and law on which the Court relies. The Court may issue a supplemental opinion further explaining its decision within 30 days after the docketing of a notice of appeal, consistent with Third Circuit Local Appellate Rule 3.1.

sitting in the driver's seat of her car, which was parked on Fourth Street, between Chestnut and Walnut Streets, in Philadelphia, waiting to pick up a friend. Another friend was also in the car.

2. At about 10:20 p.m, a car pulled up behind her. Schmotzer observed three or four men exit the car, which immediately drove off. She then observed the men enter the park on the west side of 4th Street and "split up."

3. About 20 minutes later, Schmotzer heard a women screaming for help. She then saw three or four men—whom she recognized as the men who had previously exited the car and entered the park—running up the middle of Fourth Street.

4. One of the men, whom Schmotzer later identified as Baldwin Centeno, ran past the driver's side of her car within a few feet of her car. Schmotzer viewed him long enough to describe his complexion, hair color and length, and clothing. She also briefly made eye contact with the man. There was nothing obstructing her view, and the area was lit by street lights.

5. After the men ran past her car, Schmotzer started her car and began driving down Fourth Street. She turned a corner and was then stopped by a United States Park Ranger who was investigating an alleged robbery and assault of two individuals by a group of men. Schmotzer gave a very brief written statement about what she saw.

6. On July 18, 2012, Park Ranger Eli Bowers visited Schmotzer at her house to conduct a photo array identification. The photo array contained a 2007 mug shot of Centeno and seven other photos of men with similar physical attributes. Bowers showed Schmotzer the array and asked her if she recognized any of the people depicted therein.

7. Schmotzer identified Centeno without any hesitation. Bowers did not pressure or coax the identification, and did not tell her the array contained a photo of a suspect. Bowers directed Schmotzer to sign her name on the array, and Schmotzer signed directly under the photo of

Centeno.

8. On August 8, 2012, Bowers again visited Schmotzer at her home. He showed her the same photo array containing the photo of Centeno. He asked her again if she could identify any of the men depicted in the array, and instructed her this time to circle any men she recognized. Schmotzer again identified Centeno without hesitation. She then circled his photo and signed the array.

9. The two individuals who were allegedly robbed the night of June 20, 2012, are Dana Wilson and her husband, Joseph Crumbock. At around 10:30 p.m. on June 20, Wilson and Crumbock were walking down Fourth Street between Chestnut and Walnut Streets. They passed four men standing outside of a parked car. Wilson observed the men staring at her and Crumbock, and felt threatened. After Wilson and Crumbock passed the men without incident, a fifth man approached them walking up Fourth Street. The man began verbally accosting them and eventually began pushing and hitting Crumbock.

10. Wilson began to scream for help, and the four men who had been standing by the car surrounded her and Crumbock.

11. The man who was pushing Crumbock then punched Wilson in the face. After Wilson fell to the ground, the man who punched her began trying to yank her purse from around her neck and shoulder. The other men took Crumbock's wallet and phone.

12. After the incident, Wilson and Crumbock were transported to Thomas Jefferson University Hospital for medical evaluation. Philadelphia Police Detective Michael Repici arrived at the hospital in the early hours of June 21 to interview Wilson and Crumbock. Repici took a statement from Crumbock but did not interview Wilson. Crumbock stated he could only identify the man who initially assaulted him and who punched Wilson, and not any of the other

men who were present. Repici learned later, however, that Wilson had stated she felt she could identify both the man who assaulted her and the other men present.

13. On June 26, 2013, Wilson met Repici at his office to attempt a photo array identification. Repici had created a photo array containing the 2007 mugshot of Centeno and pictures of seven other men with similar features, although two of the other men had blue eyes and three appear to have a significantly lighter complexion than Centeno. Repici showed Wilson the photo array and asked her if she recognized anyone from the night she was attacked.

14. Upon viewing the array, Wilson focused her attention on the photo of Centeno and even tapped his picture, but did not identify him to Repici as someone she recognized. When Repici observed Wilson contemplating Centeno's photo but hesitating to identify a suspect, he told Wilson not to select a photo if she was not certain. Wilson commented that she was focusing on Centeno because he was clean cut and good looking, but ultimately could not commit to an identification because she could not swear Centeno was at the scene.[2]

---

[2] Wilson and Repici offer slightly contrasting testimony regarding this identification procedure. Wilson testified she initially identified Centeno without hesitation, but when she looked up and saw Repici displaying a "blank look," she became doubtful of her identification and told him she could not swear Centeno was one of the assailants. She confirms she mentioned she was drawn to Centeno's picture because he was clean cut and good looking. The Court does not credit Wilson's testimony that she initially verbally identified Centeno's photo, as Repici would have no reason to hide such a fact. Repici testified only that Wilson tapped on Centeno's photo, but when she hesitated to identify him, Repici told her not to circle any photo unless she was 100% certain. This Court does not credit Repici's testimony regarding statements by him or Wilson regarding percentages of certainty. Wilson did not mention that Repici told her she must be 100% certain of her identification. She also did not testify that she could not commit to identifying Centeno because she was less than 100% certain; she only testified she could not swear to an identification of Centeno. Moreover, Repici's credibility was undermined by prior inconsistent statements he made during an August 29, 2012, meeting with federal law enforcement agents, which was memorialized in a memorandum. In addition, the Court is extremely troubled by the portion of the August 29 memorandum, in which Repici apparently reported that when Wilson was hesitating to make an identification, Repici told her to "take her best guess" and Wilson responded that if she had to guess, she would choose Centeno. At the suppression hearing, however, Repici testified he did not recall asking Wilson to take her best

15.     Repici instructed Wilson not to circle any photo because she could not commit to an identification, and then told her it was a shame she could not be certain about her identification of Centeno because Centeno was at the scene that night.³

16.     At the suppression hearing, Wilson testified that upon viewing the array, she initially believed in her own mind she recognized Centeno's photo with certainty, but after demonstrating her belief by speaking (which this Court finds did not occur) and pointing (which the Court finds did occur), and looking up at Repici, she began to doubt her belief because Repici displayed a "blank look."  As a result of these doubts, she informed Repici she could not swear Centeno was one of the assailants.  This Court, cannot credit Wilson's memory of her own subjective belief that she identified Centeno without hesitation because it is contradicted by Repici's objective observations and Wilson's own statement that she began to doubt herself after observing Repici's apparent lack of confirmation.  Furthermore, Wilson's own memory of her certainty is severely tainted by Repici's statement that she had initially indicated the correct person.

16.     Repici did not consider the procedure to have resulted in a positive identification of

---

guess.

³ Although Repici does not recall making this statement, this Court credits the testimony of Wilson that Repici told her Centeno was at the scene of the crime because this evidence would have been extremely noteworthy to Wilson, and it is completely reasonable that Repici does not recall a stray comment he made during one of the many photo arrays he has conducted over the previous year.  The Government suggests Repici's comment only meant that a suspect was in the photo array shown to Wilson.  The Court rejects this interpretation.  At the suppression hearing, the Assistant U.S. Attorney, in a line of questioning about Wilson's attempted photo identification of Baldwin Centeno, and immediately after eliciting testimony from Wilson that she was certain the picture of Centeno which she was tapping and pointing to depicted one of her assailants, asked Wilson if Repici ever told her "you got the right guy."  Wilson responded "well he did, later, he did say 'oh that's a shame cause he was there.'"  This Court therefore finds Wilson believed Repici was advising her Centeno was a suspect.

Centeno. He did not instruct Wilson to circle Centeno's picture or sign the photo array, something he instructed her to do for a photo array involving another suspect whom Wilson had identified.

17. On June 6, 2013, Centeno filed the instant motion to suppress Schmotzer's and Wilson's out-of-court and in-court identifications.

**DISCUSSION**

"[E]vidence of a pretrial photographic identification is inadmissible 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The same standard governs the admissibility of an in-court identification in the wake of an allegedly suggestive out-of-court identification. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972) (noting the "standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification . . . serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself"); *Stevens*, 935 F.2d at 1389 n.9 (same).

In evaluating the admissibility of such identification evidence, a court conducts a two-step inquiry. "The first question is whether the initial identification procedure was 'unnecessarily' . . . suggestive," which entails consideration of (1) whether the identification was suggestive, and (2) whether there was "some good reason for the failure to resort to less suggestive procedures." *Stevens*, 935 F.2d at 1389 (citation and emphasis omitted). The burden is on the defendant to prove the identification was unnecessarily suggestive. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). "If a procedure is found to have been

6

unnecessarily suggestive, the next question is whether the procedure was so conducive to mistaken identification or gave rise to such a substantial likelihood of misidentification that admitting the identification would be a denial of due process." *Stevens*, 935 F.2d at 1389 (internal quotation marks and ellipses omitted). This second step requires a determination whether an identification that resulted from an unnecessarily suggestive procedure is nevertheless reliable under the totality of the circumstances, including the witness's opportunity to view the criminal at the time of the crime, her degree of attention, the accuracy of her prior description of the criminal, her level of certainty at the confrontation, and the length of time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199-200.

Centeno has not met his burden of showing the identification procedure involving Schmotzer was suggestive. Ranger Bowers appropriately constructed and displayed the photo array to Schmotzer. The fact Bowers neglected to instruct Schmotzer to circle Centeno's picture during the first identification procedure does not imbue either the first or second identification procedure with impermissible suggestiveness. Moreover, this Court easily finds Schmotzer's identification of Centeno is reliable. Therefore, Centeno's motion is denied as to Schmotzer's out-of-court and in-court identifications.

The identifications by Wilson, however, will be suppressed because the out-of-court identification procedure was so unnecessarily suggestive that it gives rise to a substantial likelihood of misidentification. The Government seeks to offer at trial testimony from Wilson that, despite her failure to objectively identify Centeno's picture, she nevertheless was certain in her own mind she recognized Centeno as having been one of the men involved in the June 20, 2012, incident. Even if this Court were to accept Wilson's belief (which it does not) that she was subjectively certain she recognized Centeno's photo before expressing doubts to Repici and

ultimately refusing to commit to an identification, there is a serious problem with the procedure of the photo identification.

The problem concerns the comment by Repici that it was a shame Wilson could not commit to identifying Centeno, because Centeno was a suspect. The Second Circuit Court of Appeals succinctly described the risk of such a remark:

> In *United States v. Jarvis*, 560 F.2d 494 (2d Cir. 1977), *cert. denied*, 98 S. Ct. 1511 (1978), this Court disapproved of the practice of telling potential witnesses of the "correctness" or "incorrectness" of pre-trial identifications. The Court said that "[s]uch practices might so well taint an identification as to require reversal." . . . [T]he danger of "irreparable misidentification" is greater in cases where the witness is told that the "right" person or the suspect has been selected, than in cases . . . where the witness is told that the "wrong" person has been selected. In the former situation, the witness' belief may be improperly reinforced by the confirmatory remarks of the agents. This reduces the trustworthiness of any subsequent in-court identification because it increases the possibility that the witness will "retain in his memory the image of the (person selected) rather than of the person actually seen."

*United States v. Moskowitz*, 581 F.2d 14, 19-20 (2d Cir. 1978) (quoting *Simmons*, 390 U.S. at 383-84). Here, the risk of irreparable misidentification is particularly high because Repici's confirmation of Centeno as a suspect not only undermines the trustworthiness of any subsequent in-court identification, but also calls into question Wilson's belief, to which she intends to testify at trial, that she was initially certain she recognized Centeno's picture before doubting her memory based on perceived cues from Repici. In other words, it is impossible to rule out that Wilson's memory regarding the photo identification was tainted by the procedure—specifically, Repici's remark. This Court recognizes a witness's memory ordinarily concerns only the reliability of an identification, which is a question for the jury. In this case, however, the identification procedure tainted Wilson's memory, which is the sole basis for her proposed testimony regarding her identification.[4] Under these circumstances, the identification Wilson

---

[4] Repici did not consider Wilson to have made a sufficient identification. Repici did not write

8

would offer at trial resulted from an impermissibly suggestive procedure. *See Oliva v. Hedgpeth*, 375 F. App'x 697, 698 (9th Cir. 2010) (holding a photo identification procedure was impermissibly suggestive because the police (1) did not tell the witness that the photo array might or might not contain a photograph of the suspect; (2) suggested the first photograph selected by the witness was not the suspect; and (3) indicated the witness was correct after selecting the suspect's photograph).

Wilson's purported identification is not so reliable as to eliminate the substantial likelihood of misidentification. Although Wilson had sufficient opportunity to closely view the men standing outside of the car, her objective level of certainty during the photo identification procedure is far from reliable. Repici did not even consider it an identification for purposes of his investigation. Although Wilson now contends she always was certain she recognized Centeno's photo, her own testimony is that a mere blank stare by Repici caused her to doubt the identification such that she could not swear he was one of the assailants. Furthermore, Wilson's recollection of the certainty of her recognition of Centeno is irreparably tainted by Repici's comment that Centeno was a suspect. Accordingly, Wilson's out-of-court identification of Centeno will be suppressed.

Due to the suggestiveness of the photo identification procedure and resulting unreliability of the identification, this Court also finds the likelihood of misidentification in any subsequent in-court identification by Wilson is so great that the admission of such evidence would violate Centeno's due process rights. Wilson, therefore, may not offer an in-court identification of Centeno at trial.

---

a report of an identification and did not have Wilson circle and sign the photo array as he instructed her to do for a photo array involving another suspect whom Wilson had identified. The Government did not list Repici as a trial witness. Nevertheless, the Government seeks to have Wilson testify that she remembers being certain she recognized Centeno's photo.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, J.